IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

### STATE OF ARIZONA,
*Appellee,*

*v.*

### ANDRE MICHAEL LETEVE,
*Appellant.*

No. CR-12-0535-AP
Filed August 12, 2015

Appeal from the Superior Court in Maricopa County
The Honorable Karen L. O'Connor, Judge
No. CR2010-005965
**AFFIRMED**

COUNSEL:

David Goldberg (argued), Attorney at Law, Fort Collins, CO, Attorney for
Andre Michael Leteve

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor
General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Julie
A. Done (argued), Assistant Attorney General, Phoenix, Attorneys for State
of Arizona

CHIEF JUSTICE BALES authored the opinion of the Court, in which VICE
CHIEF JUSTICE PELANDER and JUSTICES BERCH, BRUTINEL, and
TIMMER joined.

CHIEF JUSTICE BALES, opinion of the Court:

¶1 This automatic appeal arises from Andre Michael Leteve's
convictions and death sentences for murdering his two young sons. We
have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution
and A.R.S. §§ 13-4031 and 13-4033(A)(1).

## BACKGROUND

¶2    Leteve married Laurie in 1998. They had two sons: Alec in 2004 and Asher in 2008. After Leteve revealed a series of marital infidelities, Laurie moved out of their home in August 2009 and filed for divorce two months later. On the day Laurie filed for divorce, Leteve bought a handgun. In the following months, he retaliated against Laurie in several ways. Events tragically culminated in late March 2010, when Alec and Asher were staying at Leteve's home. On the morning of March 31, Leteve called 911 to report that he had killed his two sons and attempted to commit suicide. When police arrived, they found each child shot to death, and Leteve had a gunshot wound to his face. He repeated that he had shot his sons. Police also found a letter to Laurie that Leteve had prepared days earlier. It ended by saying, "Enjoy the rest of your life without us."

¶3    A jury found Leteve guilty of two counts of first degree murder. The jury also found three aggravating circumstances: Leteve had committed the murders in an especially heinous or depraved manner, he was convicted of multiple homicides committed on the same occasion, and each victim was under the age of fifteen. A.R.S. §§ 13-751(F)(6), (F)(8), (F)(9). Considering these factors and the mitigation evidence, the jury sentenced Leteve to death for each murder.

## DISCUSSION

### A. Admissibility of Leteve's Statements to Police at His Home

¶4    Statements made by a suspect during custodial interrogation generally are not admissible unless preceded by the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Leteve argues that the trial court erred by admitting statements he made to police officers at his home before he was given *Miranda* warnings. We reject this argument because the statements were admissible under the "public safety" exception to the *Miranda* rule recognized in *New York v. Quarles*, 467 U.S. 649, 656 (1984).

¶5    Just after he killed his sons, Leteve shot himself in the chin and the bullet exited through his nose. These wounds made it difficult for the 911 operator to understand him. When he tried to tell her that he had shot his sons, ages one and five, the operator understood him to say that he had shot one son, age fifteen. She relayed this information to the police.

2

**¶6**        When the police arrived at Leteve's home, they saw Leteve bleeding profusely from his face and a young child lying on a couch. For safety reasons, Leteve was handcuffed and questioned by two officers. One officer asked Leteve if he had killed the child on the couch, and Leteve nodded up and down. As officers inspected the child, they asked Leteve where he had shot the child and he said, "In the back of the head."

**¶7**        A second officer opened Leteve's shirt to check for other injuries, asking Leteve what had happened. Leteve responded that he had shot his children. The officer asked where his children were and Leteve said one was on the couch and the other was upstairs. The officer asked Leteve to be more specific, and he said the second child was in the crib. When the officer asked Leteve where he had shot his children, Leteve again said, "In the back of the head." The officer asked Leteve what had happened to him, and Leteve answered that he had shot himself in the chin, lifting his head to show the officer the injury. The officer asked if anyone else was home, and Leteve said no. Noting Leteve's wedding ring, the officer asked, "Where is your wife?" Leteve answered, "At work." The officer then asked, "Why did you do this?" Leteve replied, "I don't know."

**¶8**        Leteve moved to suppress these statements, arguing that they were involuntary and made before he received *Miranda* warnings. The trial court ruled that the statements were voluntary and, except for Leteve's answer to the final question, admissible under *Quarles*. (At trial, after the State introduced evidence of Leteve's other statements, Leteve elicited through cross-examination that he had said "I don't know" when asked why he had done this.) On appeal, Leteve argues only that his statements were admitted in violation of *Miranda*; the State does not dispute that he was in custody and being questioned when he made the statements.

**¶9**        Under *Quarles*, a suspect's statements made in response to "questions necessary to secure [the officers'] own safety or the safety of the public" are admissible even if *Miranda* warnings have not been given. 467 U.S. at 659. Whether questioning falls within the public safety exception turns on "whether there was an objectively reasonable need to protect the police or the public from any immediate danger." *State v. Ramirez*, 178 Ariz. 116, 124, 871 P.2d 237, 245 (1994) (quoting *United States v. Brady*, 819 F.2d 884, 888 n.3 (9th Cir. 1987)).

¶10        Here, the officers reasonably asked questions to assess what had occurred (particularly given their misimpression that Leteve had reported shooting one fifteen-year-old child), to determine the nature of the injuries to those present, and to identify any remaining threats.  The only question that might be characterized as "designed solely to elicit testimonial evidence from a suspect," *Quarles*, 467 U.S. at 659, was the police asking Leteve why he had committed the murders.  Leteve, having himself introduced his response at trial, cannot object on appeal to its admission.  The trial court did not abuse its discretion in admitting evidence of Leteve's other statements to officers at his home.

## B.  Admissibility of Evidence of Leteve's Other Acts

¶11        Leteve argues that the trial court abused its discretion in admitting other acts evidence under Arizona Rule of Evidence 404(b).  That rule precludes evidence of "other crimes, wrongs, or acts" to prove the character of a defendant or "action in conformity therewith."  Ariz. R. Evid. 404(b).  Such evidence may be admissible, however, for other purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id.*  When other acts evidence is offered for a non-propensity purpose under Rule 404(b), it is also subject to Rule 402's relevance test, Rule 403's balancing test, and Rule 105's requirement that certain limiting jury instructions be given.  *State v. Ferrero*, 229 Ariz. 239, 242 ¶ 12, 274 P.3d 509, 512 (2012).

¶12        The trial court admitted evidence of Leteve's other acts to show Leteve's intent or motive.  Leteve did not object to the admission of two notes he wrote to Laurie contemporaneously with the killings.  In the first, Leteve predicted that "This should fuck you up for a good long time to come," and admonished that "none of this had to happen this way if you had made the effort."  The second note, left at the scene of the shootings and signed by both Leteve and Alec, said "For everything you get in life, you must give something up.  I wonder if you'll understand what price you'll have paid for your freedom?"

¶13        Leteve objects to evidence of various other acts reflecting that he killed his sons out of long-seething anger with Laurie and in retaliation against her.  These acts include Leteve's telling Laurie and others before their separation about his several extramarital affairs, Leteve's calling police in July 2009 in an attempt to have Laurie removed from their home,

Laurie's obtaining an order of protection a few weeks later, and police serving Leteve at his home with the order. A babysitter testified that when she was helping Laurie move out in August 2009, Leteve called Laurie and said, "I will find you guys" and something about having "a GPS system on the car."

¶14    After Laurie moved out and filed for divorce, she began dating A.M., who worked with her at a hospital. One week before the murders, Leteve sent a dozen roses, accompanied by a note purportedly written by A.M. to Laurie, to the hospital's administrator responsible for human resources. Evidently, Leteve was attempting to create problems at work for Laurie. In the days before the murders, Leteve also sent both Laurie and A.M. an email along with a sexually explicit video that Leteve and Laurie had made during their marriage. Leteve also obtained background checks on A.M. and A.M.'s ex-wife.

¶15    Finally, the State presented evidence that Leteve had substantial debt and little or no money in his bank account at the time of the murders. This evidence, the State argues, was relevant to explain why Leteve would attempt to kill himself after murdering his sons.

¶16    The challenged other acts evidence was admissible under Rule 404(b) to show Leteve's intent or motive. Leteve unpersuasively argues that his retaliatory actions against Laurie should not have been admitted because she was not the murder victim. We have long recognized that evidence of prior ill will or difficulties between a defendant and a murder victim may be relevant to show motive or premeditation. *See, e.g.*, *State v. Wood*, 180 Ariz. 53, 62, 881 P.2d 1158, 1167 (1994); *State v. Jeffers*, 135 Ariz. 404, 418, 661 P.2d 1105, 1119 (1983). Here, the past difficulties between Leteve and Laurie were similarly relevant to his intent and motive in killing their sons. Evidence of Leteve's financial difficulties was relevant to his motive in attempting to commit suicide and to establishing that the killings were planned. *See State v. DePiano*, 187 Ariz. 41, 46, 926 P.2d 508, 513 (App. 1995), *vacated in part*, 187 Ariz. 27, 926 P.2d 494 (1996).

¶17    We further conclude that the trial court did not abuse its discretion in ruling, under Rule 403, that the probative value of the other acts evidence was not substantially outweighed by the danger of unfair prejudice or needlessly presenting cumulative evidence. The trial court properly instructed the jury on the limited purposes for which the other

acts evidence could be considered, thus mitigating any prejudicial impact. *See State v. Villalobos*, 225 Ariz. 74, 80 ¶ 20, 235 P.3d 227, 233 (2010).

## C. Trial Court Rulings Limiting Leteve's Mental Health and Prescription Drug Use Evidence and Denying a Mistrial

¶18 Leteve claims that he was prevented from introducing certain admissible evidence that he lacked the mens rea necessary to commit first degree murder. We review a trial court's rulings on the admission of evidence for abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 208 ¶ 60, 84 P.3d 456, 473 (2004). We review questions of law related to the admissibility of evidence de novo. *State v. Moran*, 151 Ariz. 378, 381, 728 P.2d 248, 251 (1986). Although the trial court erred in excluding some evidence, we hold that the error was harmless beyond a reasonable doubt. *See State v. Ellison*, 213 Ariz. 116, 131 ¶ 51, 140 P.3d 899, 914 (2006).

### 1. Observation Evidence

¶19 At trial, Leteve sought to introduce testimony by his parents and by his psychological expert, Dr. Rafael Morris, to show his character trait for impulsivity. He contends that this evidence was properly admissible as "observation evidence" under *Clark v. Arizona*, 548 U.S. 735 (2006), and *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), and would have rebutted the State's premeditation evidence.

¶20 The legislature has not provided for, and this Court has refused to allow, an affirmative defense of diminished capacity. *See* A.R.S. § 13-502(A); *State v. Schantz*, 98 Ariz. 200, 212–13, 403 P.2d 521, 529 (1965). As a result, "Arizona does not allow evidence of a defendant's mental disorder short of insanity either as an affirmative defense or to negate the mens rea element of a crime." *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997).

¶21 We have, however, allowed a defendant to offer "evidence about his behavioral tendencies" to show "that he possessed a character trait of acting reflexively in response to stress." *Id.* at 544, 931 P.2d at 1054 (citing *Christensen*, 129 Ariz. at 34, 628 P.2d at 582). Such evidence has been termed "observation evidence" by the United States Supreme Court. *Clark*, 548 U.S. at 757. That Court distinguished "observation evidence" from "mental-disease evidence," which is "opinion testimony that [the

defendant] suffered from a mental disease with features described by the witness," and "capacity evidence" which concerns a defendant's "capacity to form mens rea," both of which are prohibited by Arizona law. *Id.* at 757–59.

¶22 At a pretrial hearing, Leteve argued that Dr. Morris and Leteve's parents had observed his character trait for impulsivity and that their testimony was thus admissible observation evidence under *Clark*. The trial court flatly prohibited any testimony from Dr. Morris, reasoning that he had only interviewed Leteve after the murders and that his testimony would be relevant only to a diminished capacity defense. Because Leteve's parents had observed Leteve around the time of the murders, the trial court permitted them to testify about Leteve's impulsivity, but limited that testimony to events occurring the night before and the day of the murders.

¶23 Leteve does not dispute that Arizona law prohibited Dr. Morris from testifying that he lacked the capacity to form the mens rea for first degree murder or that he acted impulsively when he shot his children. As we said in *Christensen*, "[a]n expert witness may not testify specifically as to whether a defendant was or was not acting reflectively at the time of a killing." 129 Ariz. at 35–36, 628 P.2d at 583–84. But we also acknowledged that a defendant who can show that he has a character trait for acting without reflection presents a fact that makes it more likely that he acted impulsively at the time of the murders. *Id.* at 35, 628 P.2d at 583.

¶24 That Dr. Morris did not observe Leteve's character trait on the night before or the day of the murders is not dispositive. In *Christensen*, we found that an expert witness who "had interviewed [the defendant] and had reviewed tests which had been administered to him" after the crimes should have been allowed to testify. *Id.* at 34, 628 P.2d at 582. Because Dr. Morris would have testified that Leteve had a general character trait for impulsivity, and not that he acted impulsively at the time of the murders, the trial court erred by excluding the testimony merely because the expert's observations were not contemporaneous with the crime. Were we to uphold such a restriction, it would effectively prohibit a defendant from offering any expert testimony about general behavioral characteristics that relate to the issue of premeditation, in contravention of *Christensen*. 129 Ariz. at 35, 628 P.2d at 583. The trial court likewise erred by placing temporal restrictions on the observation testimony by Leteve's parents.

**¶25**       Although the trial court erred, we will not reverse if the error was harmless.  In deciding whether error is harmless, the question "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993).  "We must be confident beyond a reasonable doubt that the error had no influence on the jury's judgment." *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).

**¶26**       Leteve offered the precluded observation evidence to rebut the premeditation element of first degree murder.  "To prove premeditation, the state must establish actual reflection and more than mere passage of time, but it may do so with all the circumstantial evidence at its disposal in a case." *State v. Boyston*, 231 Ariz. 539, 551 ¶ 60, 298 P.3d 887, 899 (2013) (internal quotation marks omitted).  Here, however, the evidence that Leteve reflected on the murders was overwhelming.  On the day Laurie filed for divorce, he purchased the weapon he used to carry out the murders.  He sent messages to Laurie that she would be alone and that "this will end badly."  When he killed his sons, he shot each in the back of the head through a pillow or blanket, and he had to walk about 100 feet after he shot Alec to then shoot Asher.  Most significantly, he left several notes and letters, one of which was typed several days before the murders and signed both by Leteve and Alec.  In short, even had evidence of Leteve's character trait for impulsivity been admitted, no reasonable juror could have concluded that Leteve had not reflected on the killings before he committed them.  *Cf. Christensen*, 129 Ariz. at 35, 628 P.2d at 583 (noting, in particular circumstances, that jury could have concluded from evidence of impulsivity that defendant did not premeditate the homicide).  Any error in excluding the evidence was harmless.

## 2.  Prescription Drug Evidence

**¶27**       Leteve argues that the trial court erred by precluding evidence of his prescription drug use at the time of the murders, which Dr. Morris asserted exacerbated Leteve's impulsivity.  Leteve argues that this evidence should also have been admitted to rebut premeditation.  The trial court ruled this evidence inadmissible because there was no proffered evidence that Leteve took the medication as prescribed.  The only way to make the evidence admissible, the court reasoned, would be for Leteve himself to testify that he was properly taking his medication.

¶28 Arizona law prohibits the defense of voluntary intoxication "resulting from . . . the abuse of prescribed medications." A.R.S. § 13-503. Our court of appeals, however, has held that this statute "does not preclude the assertion of temporary intoxication arising from the non-abusive use of prescription medication to negate the requisite state of mind for a criminal act." *State v. McKeon*, 201 Ariz. 571, 575 ¶ 20, 38 P.3d 1236, 1240 (App. 2002). That court has also held that involuntary intoxication is not an affirmative defense that has been statutorily abrogated. *State v. Edmisten*, 220 Ariz. 517, 521 ¶ 8, 207 P.3d 770, 774 (App. 2009). Though a patient may voluntarily take prescription drugs, intoxication as a result of such use may be involuntary so long as it is done pursuant to medical advice. *See, e.g.*, *People v. Garcia*, 113 P.3d 775, 780 (Colo. 2005); *State v. Gardner*, 870 P.2d 900, 902 n.8 (Utah 1993); *State v. Gilchrist*, 552 P.2d 690, 692 (Wash App. 1976). Therefore, if Leteve could establish use of prescription drugs in accordance with a doctor's instructions, he should have been allowed to present a defense of involuntary intoxication.

¶29 At trial, Leteve sought to introduce expert testimony derived from interviews with him about his use of prescription drugs, as well as circumstantial evidence in the form of testimony from others that he was taking prescription medication and pharmacy records identifying his prescribed medication. Although the best evidence of Leteve's use of prescription drugs would have been his own testimony, we do not preclude a defendant from offering evidence to prove a fact solely because it is not the *best* evidence. *See State v. Jones*, 203 Ariz. 1, 7 ¶¶ 18–19, 49 P.3d 273, 279 (2002) (holding that oral testimony of confession, rather than audio recording of confession, was admissible at trial to prove defendant confessed); *cf. People v. Hari*, 843 N.E.2d 349, 361 (Ill. 2006) (holding that involuntary intoxication instruction should have been given based on testimony of expert who had interviewed defendant).

¶30 Although the question is close, we hold that the trial court erred by precluding any evidence of the use of medication unless Leteve testified. This evidence would have been offered solely to show that Leteve did not premeditate the murders. As noted previously, *see supra* ¶ 26, the State presented overwhelming evidence that Leteve acted systematically and deliberately. Even had the prescription drug evidence been presented in conjunction with the observation evidence the defense offered, no reasonable juror could have found that the murders were not premeditated. The error, therefore, was harmless.

### 3. Waiver of Fifth Amendment Privilege to Exercise Sixth Amendment Right

**¶31**        Leteve also argues that the trial court improperly forced him to choose between waiving his Fifth Amendment privilege against self-incrimination by testifying that he had taken the medication as prescribed or waiving his Sixth Amendment right to present a defense by forgoing the medication evidence. *Cf. Simmons v. United States*, 390 U.S. 377, 394 (1968) (holding that forcing a defendant to either waive a valid Fourth Amendment claim or waive his Fifth Amendment privilege against self-incrimination is unconstitutional); *Brooks v. Tennessee*, 406 U.S. 605, 610–11 (1972) (holding that a statute requiring defendant to testify, if at all, before any other defense witnesses is unconstitutional).   We need not reach this issue because we have held that the exclusion of the prescription drug evidence was harmless error.

### 4. The Mistrial Motion

**¶32**        Leteve argues that the trial court erred by refusing to declare a mistrial during the penalty phase based on the testimony of the State's expert witness, Dr. Edward Barbieri, who testified that the level of Lorazepam in Leteve's system was within "low therapeutic levels." Previously, during the pretrial hearing addressing the admission of Leteve's prescription drug use, the State's offer of proof regarding Dr. Barbieri's testimony indicated that the levels were potentially outside the therapeutic range.  Had the offer of proof been made accurately, Leteve argues, he could have called Dr. Barbieri as a witness during the guilt phase to lay the proper foundation for admission of the medication evidence because he would have testified that the level of Lorazepam in Leteve's system immediately after the murders was within therapeutic levels.

**¶33**        "A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983).  We review the denial of a motion for a mistrial for abuse of discretion. *State v. Kuhs*, 223 Ariz. 376, 380 ¶ 18, 224 P.3d 192, 196 (2010).

**¶34**        At the pretrial hearing, the State made an offer of proof that Dr. Barbieri would testify that, although the Lorazepam in Leteve's blood

immediately following the murders was within therapeutic levels, the blood sample had been diluted by blood transfusions Leteve received during his treatment. Dr. Barbieri made the same assertion in his initial interview with the defense. No new information was presented during the penalty phase, and Dr. Barbieri did not alter his testimony from the testimony offered during the pretrial hearing. The trial court did not abuse its discretion by refusing to grant a mistrial.

## D. Jury Instruction Defining the (F)(6) Aggravator

¶35 Leteve argues that the trial court improperly instructed the jury that it need find only that he had a "parental relationship of trust" with the victim to determine that the murder was "heinous or depraved" for purposes of the (F)(6) aggravating factor. Relying on *State v. Milke*, 177 Ariz. 118, 126, 865 P.2d 779, 787 (1993), Leteve argues that the jury should have been instructed that it also had to find that the murder was senseless and the victim helpless. "[W]e review de novo whether a jury instruction correctly states the law," *State v. Zaragoza*, 221 Ariz. 49, 53 ¶ 15, 209 P.3d 629, 633 (2009), but "we will not reverse a conviction unless the instructions, taken as a whole, misled the jurors," *Kuhs*, 223 Ariz. at 384 ¶ 37, 224 P.3d at 200.

¶36 Under A.R.S. § 13-751(F)(6), a first degree murder is aggravated if "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." We have identified five factors that can lead to a finding of heinousness or depravity: (1) relishing the murder; (2) infliction of gratuitous violence; (3) needless mutilation; (4) the senselessness of the killing; and (5) the helplessness of the victim. *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). The killing of a child satisfies the senselessness and helplessness factors. *State v. Stanley*, 167 Ariz. 519, 528, 809 P.2d 944, 953 (1991). But by themselves, these two factors generally will not render a murder especially heinous or depraved. *State v. Wallace*, 219 Ariz. 1, 6 ¶ 25, 191 P.3d 164, 169 (2008).

¶37 The State argues that *Stanley* recognized that a father's murder of his own child "warrants a finding that the murder was committed in an especially depraved manner." 167 Ariz. at 529, 809 P.2d at 954. But we noted in *Stanley* that the murder was senseless and involved a helpless victim. We have subsequently explained that using the parent-child relationship as "partial support" for an (F)(6) finding, along with

helplessness and senselessness, "is constitutionally permissible." *See State v. Carlson*, 202 Ariz. 570, 584 ¶ 55, 48 P.3d 1180, 1194 (2002) (observing that *Milke* approved the use of the parent-child relationship "in partial support of a finding of heinousness or depravity").

¶38 The trial court thus erred by instructing the jury that it could find the (F)(6) aggravator based on the parental relationship alone. But the error was harmless because there was overwhelming evidence that the murders were senseless and the victims helpless. *Cf. State v. Moore*, 222 Ariz. 1, 14–15 ¶ 69, 213 P.3d 150, 163–64 (2009) (holding that, where jury was erroneously instructed that actual reflection was not required to prove premeditation for first degree murder, the error was harmless with respect to a murder for which there was overwhelming evidence of premeditation). Senselessness was incontrovertibly established because even if Leteve sought to retaliate against Laurie, it was unnecessary for him to murder his children to accomplish that goal. *Cf. Milke*, 177 Ariz. at 125, 865 P.2d at 786 (noting that "[t]his crime most certainly was senseless in that it was unnecessary for [the defendant] to *kill* her son to free herself from the responsibility of being a single mother or to prevent the boy from growing up like his father"). Similarly, each murder involved a helpless victim: each was younger than six years old and apparently sleeping when killed. *See Stanley*, 167 Ariz. at 528–29, 809 P.2d at 953–54 (noting helplessness of five-year old victim was "apparent" because she was alone with her parents and twelve-month old brother and father had just shot mother).

### E. Preclusion of Prison Expert's Testimony

¶39 During the penalty phase, Leteve sought to introduce testimony by Carson Williams, a former warden in the Department of Corrections, that Leteve would have a very difficult time in prison because of the notoriety of his crimes. The trial court did not abuse its discretion by precluding his testimony.

¶40 "A penalty phase jury may not be precluded from considering relevant mitigating evidence," including a defendant's potential for future rehabilitation and future dangerousness. *Villalobos*, 225 Ariz. at 82 ¶ 34, 235 P.3d at 235. Williams' testimony would not address either of those factors, but would instead show generally the harsh conditions a child-killer might face in prison. Such speculative evidence does not constitute a mitigating circumstance because it is not specific to a defendant's character,

12

propensities, or prior record, nor does it go to the circumstances of his offense. *Cf.* A.R.S. § 13-751(G); *Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978). Courts in other jurisdictions agree. *See, e.g., People v. Quartermain*, 941 P.2d 788, 807 (Cal. 1997); *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001).

### F. Rebuttal Testimony on Impact on Neighbors

**¶41** Leteve argues that the trial court erred in admitting testimony of C.P., a former neighbor, about the impact of the murders on him and two other neighbors. We review the admission of evidence for abuse of discretion and constitutional and statutory interpretation issues de novo. *State v. Nordstrom*, 230 Ariz. 110, 114 ¶ 8, 280 P.3d 1244, 1248 (2012).

**¶42** C.P.'s testimony was not offered as part of a victim impact statement. Instead, after Leteve presented mitigation, C.P. testified as a rebuttal witness. He told the jury that he lived two houses down from the Leteve home, had known Leteve and Laurie for two years, and had dined and otherwise socialized with them and other couples in the neighborhood. C.P. said that three days before the murders occurred, he and his adult son had talked with Leteve while C.P.'s three grandchildren played with Alec. C.P. said that although Leteve seemed "a little bit down and a little bit heavy," from the strain of his divorce and financial issues, there "was no dramatic difference between him that day and what [C.P.] had seen in the months and years before that."

**¶43** The prosecutor then asked C.P. to recount events on the day of the murders. Defense counsel objected that this was improper rebuttal. The trial court overruled the objection. C.P. then described a telephone call with his wife, which culminated with his overhearing her and another woman reacting hysterically upon learning that Leteve had shot his children. C.P. further testified that another neighbor, Kathleen - who was close to Laurie, had children Asher's age, and had given Laurie baby items to use - had been "hugely impacted" by the murders and had to be hospitalized for anxiety and panic attacks. When asked if the murders had been tough on him, C.P. emotionally responded that a year before the murders, his own adult son had suddenly died from an illness, and "so when I saw this, I could not get it. How someone could shoot their child. So it affected me deeply."

**¶44** After C.P. finished testifying, Leteve moved for a mistrial. The State argued that the testimony was appropriate rebuttal to emotional testimony by Leteve's mother and grandmother about their love for Leteve. The trial court denied the motion for mistrial. In closing argument, the prosecutor urged the jury to sentence Leteve "to the appropriate punishment for what he did to these children, to the neighbors, to everyone who knew them." The prosecutor did not otherwise mention the effect on the neighbors. The trial court instructed the jurors, and the prosecutor reminded them, that rebuttal evidence could not be considered as aggravation.

**¶45** The issue here is whether the trial court abused its discretion by admitting the testimony about the effect of the murders on C.P. and the two other neighbors. Resolving this issue turns on whether the evidence was relevant to the jury's determination whether to impose a death sentence, whether Arizona law bars evidence of a murder's impact on non-family members, and, if not, whether the admission of this evidence was so unfairly prejudicial as to violate due process.

**¶46** The challenged evidence does not involve "victim" impact testimony, which we have recognized is "limited to the 'impact of the crime on the victim's *family*.'" *State v. Rose*, 231 Ariz. 500, 512 ¶ 55, 297 P.3d 906, 918 (2013) (quoting Ariz. R. Crim. P. 19.1(d)(3)); *see also* A.R.S. § 13-752(S)(2) ("'Victim' means the murdered person's spouse, parent, child, grandparent or sibling, any other person related to the murdered person by consanguinity or affinity to the second degree or any other lawful representative of the murdered person . . . ."). Thus, C.P.'s testimony was not governed by our victims' rights laws, but instead by A.R.S. §§ 13-751(C) and (G), and 13-752(G).

**¶47** During the penalty phase, the state may offer evidence that is relevant to determining if the mitigation is sufficiently substantial to warrant leniency. *See id.* Irrespective of the mitigation evidence presented by the defendant, the state may present evidence of the circumstances of the crime. *Nordstrom*, 230 Ariz. at 114 ¶ 10, 280 P.3d at 1248 (noting that, taken together, A.R.S. §§ 13-751(G) and 13-752(G) "evince a legislative intent to permit the state to introduce relevant evidence whether or not the defendant presents evidence during the penalty phase"). Thus, the state may "rebut" mitigation - that is, a conclusion that the defendant should be shown leniency - by introducing evidence of the "specific harm caused by

14

the defendant." *State v. Forde*, 233 Ariz. 543, 572 ¶ 126, 315 P.3d 1200, 1229 (2014). The state's evidence must not be so unduly prejudicial that it renders the trial fundamentally unfair under the Due Process clause. *State v. Hampton*, 213 Ariz. 167, 179 ¶ 48, 140 P.3d 950, 963 (2006); *Payne v. Tennessee*, 501 U.S.808, 825 (1991).

¶**48**        The evidence of the murders' impact on the identified neighbors is relevant to whether Leteve should be shown leniency inasmuch as it demonstrated the specific harm his killings caused to people closely linked to the family." The threshold for relevance is a low one," *State v. Roque*, 213 Ariz. 193, 221 ¶ 109, 141 P.3d 368, 396 (2006), and the harm caused by a defendant's killing is a relevant factor for the jury to consider in making its sentencing determination. *See Payne*, 501 U.S. at 808 (noting that the victim impact evidence "illustrated quite poignantly some of the harm that [the defendant's] killing had caused" and that "there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant"); *Forde*, 233 Ariz. at 572 ¶ 126, 315 P.3d at 1229 (holding that victim impact testimony is not limited to mitigation topics presented by defense).

¶**49**        Nor does it necessarily violate due process for the jury to hear evidence of a murder's impact beyond that of the victim's family. *See Beck v. Commonwealth*, 484 S.E.2d 898, 903-04 (Va. 1997) (holding that victim impact testimony is not "constitutionally limited to that received from the victim's family members"). Indeed, several of our sister states and the federal courts of appeal allow "impact" testimony by non-family members in appropriate circumstances. *See, e.g., People v. Ervine*, 220 P.3d 820, 858 (Cal. 2009) ("[V]ictim impact evidence is not limited to the effect of the victim's death on family members, but may include its effects on the victim's friends, coworkers, and the community.") (citations omitted); *United States v. Lawrence*, 735 F.3d 385, 405–06 (6th Cir. 2013) (collecting cases interpreting the Federal Death Penalty Act, 18 U.S.C. §§ 3591 - 3599, not to limit victim impact evidence to family members).

¶**50**        But just as "[t]rial courts should not allow the penalty phase to devolve into a limitless and standardless assault on the defendant's character and history," *Hampton*, 213 Ariz. at 180 ¶ 51, 140 P.3d at 963, they should not allow evidence of a murder's impact on persons who are not immediately and closely connected to the victim. The Tenth Circuit aptly

has observed that "[i]ncluding the community in the victim-impact inquiry is fraught with complication," as doing so replaces "a close-in focus on persons closely or immediately connected to the victim with a wide view encompassing generalized notions of social value and loss." *United States v. Fields*, 516 F.3d 923, 947 (10th Cir. 2008).

**¶51** Allowing testimony about the impact of a murder on persons who are not victims under Rule 19.1(d)(3) poses a substantial risk of injecting unfairly prejudicial evidence and threatening a mistrial. Accordingly, such evidence generally should be disallowed absent a showing that it is necessary to inform the jury of the harm resulting from the crime. *Cf. Rose*, 231 Ariz. at 511 ¶ 47, 297 P.3d at 917 (cautioning prosecutors not to risk mistrial by introducing unfairly prejudicial evidence with minimal probative value). There is no need for such evidence when the State has already introduced extensive victim impact evidence, as the additional admission of evidence of a murder's impact on community members is not likely to aid in the jury's decision making. *Cf.* Ariz. R. Evid. 403 (evidence is properly excluded "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence").

**¶52** Because C.P.'s testimony was relevant to whether Leteve should be shown leniency and did not violate due process, the trial court did not abuse its discretion in admitting it. Prospectively, trial courts should limit the admission of such testimony in accordance with this opinion.

### G. Abuse of Discretion Review

**¶53** We review the jury's imposition of a death sentence for abuse of discretion. A.R.S. § 13-756(A). A finding of an aggravating circumstance is not an abuse of discretion if it is supported by the evidence. *State v. Manuel*, 229 Ariz. 1, 9 ¶ 42, 270 P.3d 828, 836 (2011). The jury's determination that death is the appropriate sentence will not be reversed "so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Id.* (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 81, 160 P.3d 203, 220 (2007)).

### 1. Aggravating Circumstances

¶54        As explained above, ¶35–38, the jury's finding that each murder was heinous or depraved (the (F)(6) aggravating circumstance) is supported by the evidence. Leteve does not contest the sufficiency of the evidence to support the other two aggravators found by the jury with respect to each murder − (F)(8) (multiple homicides) and (F)(9) (victims under the age of fifteen). Because the record supports these findings, the jury did not abuse its discretion.

### 2. Mitigating Circumstances

¶55        "The defendant must prove the existence of the mitigating circumstances by a preponderance of the evidence," but "the jurors do not have to agree unanimously that a mitigating circumstance has been proven to exist." A.R.S. § 13-751(C).

¶56        Leteve presented extensive mitigation evidence, including that he was thirty-nine years old at the time of the murders; his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was substantially impaired; he was a good father and son and tried to be a good husband and a good provider for his family; he was a good friend and employee; he suffered from alcoholism; he suffered from bipolar disorder and other mental illnesses and did not receive proper treatment; he self-medicated with drugs and alcohol; he was devastated by the collapse of his marriage; he lacked support from his family; he suffered financial ruin, overwhelming stress, and abuse and neglect as a child; he tried to make the best of his life; he was a good student and consistently tried to improve himself; and he lacked a positive male role model.

### 3. Propriety of Death Sentences

¶57        Given the three aggravating circumstances and the mitigation presented, a reasonable juror could conclude that the mitigating circumstances were not sufficiently substantial to call for leniency.

## H. The Trial Court's Restitution Order

**¶58**        The trial court ordered Leteve to pay restitution for the victims' out-of-pocket expenses to attend the trial and attorney fees incurred to enforce victims' rights.  Leteve challenges the restitution order on several grounds.  Reviewing the facts in the light most favorable to upholding the order, *State v. Lewis*, 222 Ariz. 321, 323 ¶¶ 2, 5, 214 P.3d 409, 411 (App. 2009), we conclude that the trial court did not abuse its discretion. (We assume, without deciding, that attorney fees incurred to enforce victims' rights may be compensable in restitution, as Leteve has not raised that issue on appeal.)

**¶59**        Leteve first argues that, because the victims' counsel did not provide itemized billing statements, it is impossible to identify the amount of the fees attributable to enforcing victims' rights.  But neither the victims' rights laws nor their implementing rules explicitly require itemized billing. *Cf.* ARCAP 21(b) (requiring a party seeking attorneys' fees incurred on appeal to file an itemized statement of fees and costs).  And the trial court held a hearing on the requested restitution and received evidence to which Leteve could object.  *Cf. Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 544–45, 647 P.2d 1127, 1142–43 (1982) (holding that there is no violation of due process when "[a] full hearing was conducted on the issue of attorney's fees").  Because counsel's affidavits supported the restitution order, the State met its burden of proving the amount by a preponderance of the evidence.  *See Lewis*, 222 Ariz. at 324 ¶ 7, 214 P.3d at 412.

**¶60**        Leteve next argues that restitution should be offset by the value of property Laurie received after their divorce.  Because Laurie would have received her share of marital property even if the murders had not occurred, any property she received from the divorce proceedings is irrelevant.

**¶61**        Finally, Leteve argues that restitution should be reduced by the amount he alleges Laurie received from a charitable fund established after the murders.  A victim's reimbursement from collateral sources does not reduce a defendant's restitution obligation.  At most, such reimbursement, if made by a qualifying entity, would require a defendant to pay restitution to the entity instead of the already-compensated victim. A.R.S. § 13-804(E).

## I. Additional Issues

**¶62**        Stating that he wishes to preserve certain issues for federal review, Leteve lists thirty one constitutional claims and previous decisions rejecting them.  We decline to revisit these claims.

## CONCLUSION

**¶63**        We affirm Leteve's convictions and sentences.