NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JOHN FRANKLIN WRIGHT, III, *Appellant.*

No. 1 CA-CR 25-0073

FILED 05-14-2026

Appeal from the Superior Court in Maricopa County
No. CR2023-128285-001
The Honorable Suzanne Marie Nicholls, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Bain & Lauritano PLC, Glendale
By Sheri M. Lauritano
*Counsel for Appellant*

―――――――――――――――

**MEMORANDUM DECISION**

Presiding Judge Michael S. Catlett delivered the decision of the Court, in which Judge Angela K. Paton and Judge Jennifer M. Perkins joined.

―――――――――――――――

**C A T L E T T**, Judge:

¶1        John Franklin Wright III ("Wright") appeals his convictions on four counts of sexual conduct with a minor, two counts of furnishing obscene or harmful items to a minor, and one count of child molestation. Because the court did not err, we affirm his convictions.

## FACTS AND PROCEDURAL HISTORY

¶2        Wright is related to A.C. by marriage. In 2023, when A.C. was nine years old, a witness ("9-1-1 Caller") summoned police to a parking lot where Wright and A.C. were in his car because she saw "a man . . . and a little girl . . . doing inappropriate things; she is going down on him" and because Wright was "licking his fingers and touching her." ("the Parking Lot Incident"). The 9-1-1 Caller told the operator she would not further cooperate with the investigation because she was traumatized.

¶3        Police transported Wright to the police station where they interviewed him and collected DNA from his person, including his genitals. During the interview, he admitted having sexual contact with A.C.

¶4        A.C. underwent a forensic interview and a sexual assault nursing exam ("SANE exam"). Several days later, A.C. underwent a second forensic interview. During those interviews, A.C. disclosed additional incidents of sexual contact with Wright.

¶5        The State charged Wright based on the Parking Lot Incident and prior incidents of abuse that A.C. disclosed during the interviews.

## I.    Trial

¶6        At trial, A.C. testified about the Parking Lot Incident, including that Wright showed her a pornographic video on his phone and details about Wright's sexual conduct. She also testified about her two forensic interviews and SANE exam. And she testified about other

incidents of sexual abuse Wright committed before the Parking Lot Incident.

¶7        The 9-1-1 Caller was unavailable to testify despite police efforts to locate her, but another witness present during the Parking Lot Incident testified.  She said the 9-1-1 Caller flagged her down to ask that she block Wright's car with her truck to prevent him from leaving.  She also said, upon stopping her truck, she saw Wright lift A.C. from his seat into the back seat of his car, but that she saw nothing beforehand.

¶8        A DNA analyst testified that a DNA profile consistent with Wright's was present on a swab taken from A.C.'s genitals.  Due to the overwhelming presence of A.C.'s DNA on the swab, the analyst could only say, based on chromosomal haplotype, that the male DNA on the swab came from Wright or another male in his paternal family, with only a 1 in 5,471 chance that it came from a different male in the United States.  The analyst also testified that A.C.'s DNA was definitively present on a swab taken from Wright's genitals.

¶9        The State called a "blind" expert witness—a witness who knows nothing about the underlying facts in the case.  She confirmed she knew nothing about Wright's case and clarified her role was to educate the jury about sexual abuse.  She explained how victims of sexual abuse respond.  She also informed the jury about the five stages of victimization, and why a child victim might delay disclosing an assault.  She also described the various ways a child may make such a disclosure.  And she talked about the psychological impacts sexual abuse can have on children.  She also gave background information on what a forensic interview is, how it is conducted, and its purpose.

¶10       Detective Swingle ("Swingle") testified that he interviewed Wright after the Parking Lot Incident.  Swingle testified that the State's redacted version of the recorded interview omitted parts when neither he nor Wright was speaking and when Wright was alone in the room.  The State moved to admit and publish the redacted interview recording, and Wright did not object.

¶11       The State played clips from the interview and paused intermittently to ask Swingle questions about them.  He explained that he gave Wright false information during the interview, including talking to Wright about non-existent video surveillance at the scene of the Parking Lot Incident.  Swingle explained that using ruses during an interview is a legitimate technique used to make a subject believe the interviewer knows

more about a case than he actually does, which can "get the truth to come out." Swingle and the State clarified to the jury multiple times that there was in fact no surveillance video of the scene.

**¶12**        Swingle testified that interviewees downplay criminal conduct initially and disclose more truth in stages as the interview progresses. The clips the jury viewed showed Wright admitting to additional sexual contact with A.C. as the interview unfolded, including after Swingle raised the possibility of physical and video evidence.

**¶13**        The case agent ("Gundry") testified that on the day of the Parking Lot Incident, she heard the call about Wright over her police radio and responded to the scene. Upon arriving, Gundry spoke with A.C. and, based on that conversation, she arrested Wright and ordered that A.C. undergo a forensic interview and SANE exam.

**¶14**        Because A.C. did not remember some things she said in her second forensic interview, Gundry laid foundation for portions of that recorded interview. In the first clip, A.C. said, while at home, Wright showed her a pornographic video on his tablet that depicted oral sex and intercourse between a man and woman. In the second clip, she said Wright touched his genitals to hers, also while at home.

## II.    Mistrial Motion

**¶15**        On day six of trial, the State first disclosed four body camera videos showing Gundry's interviews with Wright's wife, son, and both together, as well as A.C.'s father and stepmother. Wright moved for a mistrial because the late disclosure "[c]aused [i]rreparable [p]rejudice to the Defense." The State responded in writing but that document is not in the record. The next morning, the parties discussed the issue at length with the court.

**¶16**        Wright did not allege the State's late disclosure was knowing or willful, but he argued the videos may contain exculpatory evidence and information that would have changed how he prepared for trial and how he cross-examined already dismissed witnesses. The court probed how Wright's pre-trial preparation would have differed if he had this new information, and whether the videos revealed new information. Wright could not fully articulate how the videos prejudiced him or what an appropriate lesser remedy could be without having seen the footage.

**¶17**        The State argued a mistrial was unwarranted because less extreme remedies were available, such as recalling witnesses and granting

Wright additional time to prepare. The State also argued the court had already precluded much of what the videos contained and Wright already knew the information in the videos. The court reviewed the videos. Wright brought up another late disclosure he received that morning—a police report about Wright possibly abusing another victim. Wright argued that new disclosure contained other-act evidence and could lead to additional charges.

¶18 The State argued mistrial was still unwarranted because the evidence involving another victim was inadmissible and additional charges likely would not have changed Wright's lack of interest in plea negotiations. The State also argued that both it and Wright had no interest in introducing the evidence, so there was no issue.

¶19 The court informed the parties it had "reviewed the four body cams . . . multiple times, many, many, many times." It explained it saw nothing exculpatory in the videos and that most of the content was irrelevant, already precluded, or protected by the rape-shield law. Wright insisted he was still prejudiced because if he had seen the videos earlier, he would have prepared differently for trial.

¶20 The court explained that it weighed Wright's and A.C.'s constitutional rights as well as the disclosure violation, and it acknowledged that a mistrial "is an extreme sanction that should be reserved for those most extreme circumstances." It found the body cameras contained only irrelevant information, hearsay, or information already precluded before trial, so Wright suffered no prejudice from their late disclosure. As to the supplemental police report about another potential victim, the court acknowledged that the State would not be seeking to introduce it.

¶21 The court denied Wright's mistrial request because it found "there are less severe remedies" available. It precluded all evidence related to a second potential victim. It also permitted Wright to reinterview the two witnesses related to the late disclosures and, if necessary, recall one who already testified.

¶22 The next day, Wright renewed his mistrial motion after another undisclosed page of material surfaced. The State argued that page was part of the original late disclosure and it referenced nothing not already in evidence. The court affirmed its ruling denying a mistrial because the information in the document was largely discussed during the initial mistrial argument.

¶23 Before Wright testified, he sought assurance from the court that nothing in the late disclosed evidence would come in, and the court responded that it was "all off the table."

¶24 On day nine of trial, the court asked Wright if he had gone through all the late disclosures and done "whatever [he] needed to do[.]" Wright said "[w]e got nothing" and that there was no issue.

¶25 The jury found Wright guilty on all seven counts. The court sentenced Wright to four consecutive life sentences followed by an additional combined 22 years' incarceration for the three other convictions.

¶26 Wright timely appealed. We have jurisdiction. *See* A.R.S. §§ 13-4031, 4033(A)(1).

## DISCUSSION

¶27 Wright argues the superior court erred in three ways. First, by denying his mistrial motion after the State untimely disclosed videos and documents several days into trial. Second, by allowing a blind expert to testify about child sexual abuse. And third, by admitting a video into evidence showing Wright's custodial interview, during which Swingle used "ruses" which may have misled the jury. We address each alleged error in that order.

### I. Motion for Mistrial

¶28 Wright argues the State's late disclosure of four body camera videos violated the State's duty to disclose and caused him irreparable harm. Again, during trial, the State disclosed four body camera videos showing Gundry's interviews with Wright's wife, son, and both together, as well as A.C.'s father and stepmother.

¶29 We review the superior court's decision granting or denying a mistrial for an abuse of discretion because it "is the most dramatic remedy . . . and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Leteve*, 237 Ariz. 516, 526 ¶ 33 (2015) (citation omitted). The superior court "is always in the best position to determine whether a particular incident calls for a mistrial." *State v. Koch*, 138 Ariz. 99, 101 (1983).

¶30 When a party violates disclosure obligations under Arizona Rule of Criminal Procedure ("Rule") 15.1, the court has broad discretion to fashion a remedy. *See* Ariz. R. Crim. P. 15.7(c). First, the court must

"determine the significance of the information not timely disclosed," the overall impact on the case, the stage of the proceedings when the party ultimately made the disclosure, and the impact of the chosen sanction on both the party and the victim. *Id.* Available sanctions include declaring a mistrial, precluding use of the evidence, and "any other appropriate sanction." Ariz. R. Crim. P. 15.7(c)(1), (3), (6). We review the court's sanction for an abuse of discretion. *See State v. Strong*, 258 Ariz. 184, 214 ¶ 137 (2024) (determining superior court did not abuse its discretion after weighing possible harm and crafting an appropriate remedy for late disclosure).

¶31        The State argued that much of the information on the late-disclosed videos was already precluded or already known by Wright. Wright argued he suffered prejudice because he would have prepared differently for trial. The court watched the videos multiple times and concluded they did not contain exculpatory evidence. To the contrary, the court concluded that much of the videos' content was "either irrelevant to the case, protected by the rape shield laws, or has already been precluded[.]" The court pressed Wright to explain how the videos prejudiced him—how he would have prepared differently for trial were they timely disclosed. Wright answered that if he had the videos before interviewing the witnesses, preparing for the interviews would have been easier.

¶32        The court considered the late-disclosed information and balanced both Wright's and A.C.'s constitutional rights. Because the information in the videos was either irrelevant, inadmissible hearsay, or precluded under the rape shield laws and the court's pretrial rulings, the court found the information was not substantial and was nonprejudicial. We agree with the court's analysis and conclusion. The State used none of the information contained in the videos against Wright. And Wright's attorney knew most of the information in the videos before their disclosure.

¶33        The court also crafted an appropriate remedy to ensure the late disclosure did not prejudice Wright. This included precluding any other-acts evidence, allowing Wright additional time to review the late-disclosed materials, allowing Wright to re-interview two witnesses, and allowing Wright to recall another witness if he so chose. The court asked if Wright sought any other remedies; Wright said no. Ultimately, Wright neither re-interviewed the two witnesses nor recalled the other witness.

¶34 The court did not abuse its discretion in denying Wright's mistrial request. Rather, the court weighed the relevant competing interests and crafted an appropriate remedy. The court did not err.

## II. Blind Expert Witness Testimony

¶35 Wright next argues the court erred by allowing a blind expert witness to testify. He argues the expert's testimony, including that the first step of child sexual abuse is victim selection, "painted a picture drastically different" from the allegations. He argues the expert's testimony was "highly prejudicial" and caused the jury to "infer more sinister behavior by [Wright] that was neither charged nor proven in court."

¶36 Typically, we review a court's admission of expert testimony for an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 210 ¶ 69 (2004). But because Wright did not object to the expert's testimony at trial, we review for fundamental and prejudicial error. *See State v. Escalante*, 245 Ariz. 135, 140 ¶ 12 (2018). First, we determine whether the court erred. *Id.* at 142 ¶ 21. If so, then we determine whether Wright has shown that "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* (emphasis in original).

¶37 Wright has not shown that the court erred by allowing the blind expert witness's testimony. His argument that the testimony misled the jury to believe Wright engaged in more sinister conduct than the State charged him with is unavailing. The State and the expert witness repeatedly clarified that the expert knew absolutely nothing about the case. And the expert gave only general information to educate the jury, including about what a forensic interview is, how it is conducted, and typical behaviors sexual abusers and their victims may exhibit. The expert's testimony did not attribute any specific behavior or conduct to Wright or A.C.

¶38 And the testimony was relevant. The State referenced the expert's testimony when asking Gundry about what she saw during A.C.'s second forensic interview. The State appropriately described the expert's testimony during its closing argument, reminding the jury that the expert knew nothing about the case. The State used the expert's testimony to remind the jury how forensic interviews work, how children disclose abuse in different ways, and how abuse can affect a child's memory. The court did not err, let alone commit fundamental error, by allowing the blind expert witness to testify generally about child sexual abuse. *See State v.*

*Lujan*, 192 Ariz. 448, 452 ¶ 12 (1998) ("When the facts of the case raise questions of credibility or accuracy that might not be explained by experiences common to jurors—like the reactions of child victims of sexual abuse—expert testimony on the general behavioral characteristics of such victims should be admitted."); *State v. Haskie*, 242 Ariz. 582, 586 ¶ 16 (2017) ("[E]xpert testimony that explains a victim's seemingly inconsistent behavior is admissible to aid jurors in evaluating the victim's credibility.").

**¶39**          Even if Wright has shown error, he has not shown that the expert's testimony prejudiced him.  Given the weight of the evidence against him, Wright has not shown that, but for the expert's testimony, the outcome of the trial could have been different.  *See State v. Hippensteel*, ___ Ariz. ___ , ___, 572 P.3d 579, 584 ¶ 22 (App. 2025) (prejudice exists if the jury "could have" reached a different verdict and the "could have" standard is hard to meet) (cleaned up).  The jury watched a video of Wright confessing to sexual contact with A.C., heard A.C. describe in detail what Wright did to her, and heard that police collected A.C.'s DNA from Wright's genitals. Wright has not shown prejudicial, fundamental error.

## III.    Admission of Wright's Interview

**¶40**          Wright lastly argues the court erred by admitting the video of his custodial interview.  He argues that video prejudiced him because Swingle used "ruses," which suggested to the jury that non-existent evidence actually existed.  Specifically, Wright complains that the jury saw Swingle tell him during the interview that surveillance video of the Parking Lot Incident existed and that witnesses made statements to police about his actions.  Swingle testified that using ruses during an interview is a legitimate technique to make a subject believe the interviewer knows more about a case than he actually does, which can "get the truth to come out."

**¶41**          We generally review the admission of evidence for an abuse of discretion.  *Leteve*, 237 Ariz. at 523 ¶ 18.  But when a defendant does not object to the admission of that evidence, we review for fundamental error. *See State v. Tacho*, 113 Ariz. 380, 384 (1976).

**¶42**          Wright argues he objected to the interview video.  The record belies that contention.  In fact, when the State moved to admit and publish the video, the court asked Wright if he had any objection; he said "no." Wright objected only to the State playing clips of the interview during its opening statement, but even then he predicted that the video would be admitted during trial.  Because Wright did not object to the video coming into evidence, we review for fundamental error.

¶43        The jury watched the redacted video of Wright confessing to sexual contact with A.C. in his car.  Swingle explained what a ruse was and how he used that tactic in his interview with Wright.  Both Swingle and the State clarified multiple times that video surveillance of the Parking Lot Incident did not exist.  So Wright's argument that the statements were "never corrected before the jury" and that he "had no meaningful opportunity to rebut" the supposed implications falls flat.

¶44        Wright has shown no error, let alone fundamental error.  Nor has he shown prejudice.  *See supra* ¶ 39.

## CONCLUSION

¶45        We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR