NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

LAWRENCE EDWARD HARRELL, JR., *Appellant.*

No. 1 CA-CR 21-0352
FILED 7-12-2022

Appeal from the Superior Court in Maricopa County
No.  CR 2019-123786-001
The Honorable Dewain D. Fox, Judge
The Honorable Michael Mandell, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Brian Coffman
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Robert W. Doyle
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Randall M. Howe and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1   Lawrence Harrell appeals his conviction and sentence for manslaughter. He challenges the exclusion of certain evidence concerning the victim's reputation and the scope of the State's redirect examination of two witnesses. Finding no reversible error, we affirm.

## BACKGROUND[1]

¶2   One evening, Harrell and his pregnant girlfriend, Candida Tolbert, went out to get some fast food. While walking up to an outdoor order window, they encountered the victim, whom they knew. Initially, Harrell and the victim greeted each other and shook hands, but their meeting quickly turned confrontational, with the victim accosting both Harrell and Tolbert. The exchange escalated when Harrell swung at the victim and then pursued him as he dropped his belongings and backed away. Within seconds of throwing his first punch, Harrell brandished a gun and fired a single shot that struck the victim in the buttocks and traveled through his left leg in a downward trajectory, severing several major arteries.

¶3   After firing the shot, Harrell grabbed the victim's belongings and then fled the scene. The victim also attempted to flee but was only able to limp a short distance before collapsing on a nearby sidewalk.

¶4   Although witnesses called 9-1-1, by the time emergency responders arrived, the victim was in "grave condition" and lying in a large pool of blood. Medical personnel rendered first aid, but the victim succumbed to his gunshot injuries, dying shortly after arriving at a local hospital.

¶5   Detectives reviewed surveillance videos recorded by the restaurant's security cameras. By isolating still images from a surveillance

---

[1]  We view the facts in the light most favorable to sustaining the verdict. *See State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

video and distributing the pictures through the Silent Witness program, detectives identified Harrell and Tolbert. Although multiple surveillance videos depicted Harrell's and Tolbert's initial encounter with the victim, none captured the shooting because the three had moved out of the security cameras' fields of view following Harrell's initial swing. By the time Harrell moved back into one camera's view—18 seconds after later—he had already shot the victim.

¶6        After interviewing Harrell and Tolbert, the State charged Harrell with one count of second-degree murder. The State also alleged aggravating circumstances and that Harrell had historical prior felonies and committed the offense while on probation.

¶7        At trial, Harrell acknowledged shooting the victim, but claimed he acted in self-defense and to protect Tolbert and their unborn child. He explained that the victim, despite the initial handshake greeting, had threatened to kill him and Tolbert, so he swung at the victim in anticipation of an attack. According to Harrell, the victim then punched him to the ground and crouched down over him. While the victim allegedly pinned him down, Harrell called to Tolbert for help and she moved toward him, offering the gun. Harrell claimed that as he struggled for the gun, the victim reached toward his own waistband. Purportedly fearing that the victim would withdraw a gun, Harrell shot the victim.

¶8        After a 12-day trial, a jury found Harrell guilty of the lesser offense of manslaughter. The jury also found two aggravating factors—that the offense involved the use of a deadly weapon and that it caused emotional or financial harm to the victim's immediate family. At the sentencing hearing, the superior court found that Harrell had two prior felony convictions and sentenced him as a category 3 offender to a term of 20 years' imprisonment. Harrell timely appealed.

## DISCUSSION

### I.        Exclusion of Reputation Evidence

¶9        Harrell contends he should be granted a new trial because the superior court precluded evidence that the victim had a reputation for carrying a firearm. Harrell argues that the exclusion of this reputation evidence infringed on his ability to present a full defense—that he reasonably believed the victim posed an imminent threat to his safety.

¶10        We review evidentiary rulings for a clear and prejudicial abuse of discretion. *State v. Ayala*, 178 Ariz. 385, 387 (App. 1994). In

conducting our review, we defer to the superior court's assessment of relevance and unfair prejudice. *See State v. Via*, 146 Ariz. 108, 122 (1985) (noting that deference is appropriate because the superior court is best positioned to balance probative value and prejudice). A court abuses its discretion when the reasons given for its decision are unsupported by the record, "clearly untenable, legally incorrect, or amount to a denial of justice." *State v. Gentry*, 247 Ariz. 381, 385, ¶ 14 (App. 2019); *State v. Cowles*, 207 Ariz. 8, 9, ¶ 3 (App. 2004).

¶11         Before trial, Harrell moved to admit evidence of the victim's other acts under Arizona Rules of Evidence (Rule) 404(b). Harrell asserted that the other-act evidence, and his knowledge thereof, was admissible to prove he reasonably believed that the victim posed a threat to his life. Specifically, Harrell sought to introduce evidence that the victim "was an active" gang member, had "participated in a turf war," had "mercilessly beat" two people, had conducted "at least four drive by shootings," and "ha[d] been known to carry a gun on his person."

¶12         At an evidentiary hearing on the motion, Harrell testified that he (1) learned of the victim's gang affiliation from friends and social media, and (2) heard "[t]hrough mutual friends," family members, and from social media that the victim had been involved in a turf war between rival gangs and, as part of that activity, had (a) participated in drive-by shootings, and (b) beaten multiple people, including a 15-year-old child. Recounting three occasions that *he* observed the victim possess a gun, Harrell also testified that the victim was "just known [] to have a gun."

¶13         After hearing Harrell's testimony, the superior court granted his motion in part, allowing specific-act evidence that the victim carried a gun in Harrell's presence admissible. But apart from the acts for which Harrell had personal knowledge, the court found his testimony "lacking in credibility and speculative." Accordingly, the court precluded evidence that relied on "third party accounts," *i.e.*, the victim's purported gang membership, participation in drive-by shootings, and physical assaults. Moreover, applying the Rule 403 balancing test, the court found the probative value of the excluded evidence was substantially outweighed by the danger of unfair prejudice. *See* Ariz. R. Evid. 403.

¶14         In a motion to reconsider, Harrell moved to admit evidence of the victim's character and specific other acts, including the victim's reputation as a "drug dealer who was known to carry a gun," under Rules 404 and 405—again arguing that the excluded evidence was admissible to

show that he "justifiably feared for his life and acted reasonably to defend himself." The superior court denied the motion.

**¶15**　　　Undeterred, Harrell moved in limine to admit evidence of the victim's reputation for violence, including, among other things, that he carried a gun. In support of his motion, Harrell submitted an offer of proof, stating, in relevant part: "Harrell heard that [the victim] carried a weapon."

**¶16**　　　At the outset of trial, the superior court again conducted a Rule 403 balancing test and precluded Harrell from testifying that the victim had a reputation for possessing a gun, specifically noting the poor "quality of the evidence" supporting the assertion and its minimal probative value. The court revised the previous ruling in part, however, allowing Harrell to testify to the victim's general reputation for violence.

**¶17**　　　"The constitutional right to due process guarantees a criminal defendant a meaningful opportunity to present a complete defense." *State v. Rhodes*, 219 Ariz. 476, 478, ¶ 10 (App. 2008) (internal quotation and citation omitted). The constitution does not, however, guarantee a defendant the right to present a defense "in whatever manner and with whatever evidence [the defendant] chooses." *State v. Carlson*, 237 Ariz. 381, 393, ¶ 36 (2015) (internal quotation and citation omitted). In other words, a defendant's right to present evidence in support of his defense, though constitutionally protected, is nonetheless subject to the rules of evidence. *See id.*

**¶18**　　　In general, relevant evidence is admissible unless it is otherwise precluded by the federal or state constitution, an applicable statute, or rule. Ariz. R. Evid. 402. Evidence is relevant if "it has any tendency" to make a fact of consequence in determining the action "more or less probable than it would be without the evidence." Ariz. R. Evid. 401(a). Relevant evidence may be excluded, however, if its probative value "is substantially outweighed" by a danger of unfair prejudice. Ariz. R. Evid. 403.

**¶19**　　　Character evidence is generally inadmissible "to prove that a person acted in conformity therewith," but "an accused may offer proof of [a] victim's reputation for violence when an issue of self-defense is raised." *State v. Zamora*, 140 Ariz. 338, 340 (App. 1984) (citing Ariz. R. Evid. 404(a)(2) (permitting evidence of a pertinent trait of character of the victim offered by an accused)); *see also State v. Fish*, 222 Ariz. 109, 121, ¶ 37 (App. 2009) ("When offered to prove a defendant reasonably feared for his safety and used a reasonable degree of force in light of that fear, character evidence is

not propensity evidence; rather, it is offered to prove the defendant's state of mind and the reasonableness of his actions."). To establish a justification defense, a "defendant may offer into evidence specific instances of violence committed by the victim," if he "knew of them," or "reputation or opinion evidence that the victim ha[d] a violent or aggressive character trait." *State v. Connor*, 215 Ariz. 553, 558-59, ¶ 13 (App. 2007) (internal quotation and citation omitted); *see also* Ariz. R. Evid. 405(a) (permitting the introduction of reputation or opinion evidence concerning a character trait). This type of evidence is admissible "to show that the defendant was justifiably apprehensive of the decedent and knew that the decedent had a violent disposition, and that this may have affected the defendant's thinking about the need to respond with deadly physical force." *Connor*, 215 Ariz. at 559, ¶ 14 (internal quotation and citation omitted).

¶20        At trial, the superior court permitted Harrell to testify that the victim had a reputation for violence, that he had seen the victim in possession of a gun on multiple prior occasions, and that his knowledge of the victim's specific acts and character caused him to fear for his life and the safety of Tolbert and their unborn child. The superior court precluded Harrell from testifying, however, that other people had told him that the victim carried a gun.

¶21        On this record, we find no abuse of discretion. The superior court did not permit Harrell to testify that the victim had a reputation for carrying a gun because Harrell failed to offer any substantive evidence to support this assertion. Indeed, the court excluded Harrell's proffered testimony concerning the victim's purported reputation for carrying a gun as wholly speculative, predicated on "mere rumor," and lacking any "indicia of reliability." While the excluded evidence was arguably relevant to explain Harrell's state of mind, the court properly applied Rule 403's balancing test and determined the danger of unfair prejudice substantially outweighed the slight probative value of Harrell's proffered testimony. Stated differently, given the paucity of evidence supporting Harrell's offer of proof, the superior court acted well within its discretion by limiting the scope of his reputation testimony. *See State v. Zaid*, 249 Ariz. 154, 158, ¶ 13 (App. 2020) (considering the strength of evidence supporting reputation testimony in determining whether the superior court properly excluded the testimony).

¶22        Moreover, even if the superior court improperly curtailed Harrell's reputation testimony, such error was necessarily harmless. *See id.* at 160, ¶ 22 (explaining the improper preclusion of a defense witness's testimony is harmless when "the witness's testimony would have been

merely cumulative of other evidence in the case") (internal quotation and citation omitted). First, consistent with the superior court's finding, the mere possession of a gun provides "minimal probative value on the possessor's aggressive character." *Zamora*, 140 Ariz. at 340. Second, and more importantly, the superior court permitted Harrell to testify about multiple occasions when he observed the victim in possession of a gun. Of the "methods of proving character" permitted by the evidentiary rules, "evidence of specific instances of conduct is the most convincing." *State v. Lehman*, 126 Ariz. 388, 391 (App. 1980) (internal quotation omitted). Given his testimony that he knew the victim's reputation for violence and had actual knowledge of the victim's prior possession of a gun, Harrell had the opportunity to present his full defense to the jury and argue that he feared for his life when he shot the victim. In fact, the prosecutor acknowledged during his closing argument that Harrell contended that the victim's reputation for carrying a gun led him to fear for his life. *See State v. Romero*, 240 Ariz. 503, 510, ¶ 15 (App. 2016) ("Whether an error is harmless may also be considered in the context of a party's ability to present the substance of his claim or defense."). Therefore, the superior court did not err, much less commit reversible error, by excluding Harrell's testimony that the victim had a reputation for carrying a gun.

## II.     Scope of State's Redirect Examination

**¶23**     Harrell also argues he should be granted a new trial because the superior court, over defense counsel's objections, permitted the prosecutor to question two witnesses on redirect examination concerning matters outside the scope of cross-examination. Implicit to this argument, Harrell contends that the court's rulings deprived him of his right to fully confront adverse witnesses.

**¶24**     We review a superior court's evidentiary rulings and restrictions on witness examination for an abuse of discretion. *State v. Romero*, 248 Ariz. 601, 606, ¶ 22 (App. 2020). While no rule expressly limits the scope of redirect examination, *see* Ariz. R. Evid. 611 (governing how a court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence"), as a general practice, courts restrict questioning on redirect examination to the subject matter of cross-examination. *See State v. Hicks*, 133 Ariz. 64, 68-69 (1982); *see also State v. Walden*, 183 Ariz. 595, 611 (1995) (concluding evidence introduced on redirect examination of victim was within the scope of cross-examination, given the defendant's cross-examination attack on purported inconsistencies in the victim's direct testimony), *rejected on other grounds by State v. Ives*, 187 Ariz. 102, 106 (1996); *State v. Henry*, 176 Ariz. 569, 581 (1993)

(holding a defendant was not entitled to recross-examination when redirect examination raised "nothing new").

¶25         In the event a prosecutor elicits new evidence on redirect, however, defense counsel may request the opportunity to recross-examine a witness. *State v. Jones*, 110 Ariz. 546, 550-51 (1974), *overruled on other grounds by State v. Conn*, 137 Ariz. 148, 151 (1983). Although the right to confront and question adverse witnesses is of "fundamental importance," a defendant is entitled to recross-examination only for the limited purpose of "clarify[ing] any new or confusing matters brought out during redirect." *Id*.

### A.    Tolbert's Trial Testimony

¶26         On direct examination, Tolbert testified that Harrell, alone, possessed a gun on the night of the shooting. When questioned about a recorded conversation that she had with Harrell on the second day of trial, in which she stated, "*[s]upposedly I'm the one that gave you the gun*," Tolbert reiterated that she "never had possession of a gun ever."

¶27         On cross-examination, defense counsel asked Tolbert whether she "ever stole a gun" from a named third party. Rather than answering directly, Tolbert responded by repeatedly stating that defense counsel's question had "nothing to do with" the underlying events. In a lengthy and argumentative exchange, defense counsel then confronted Tolbert with a statement she made to Harrell during *another* recorded phone call. When pressed, Tolbert admitted that she *did* state she had stolen a gun during *that* conversation, but she maintained that defense counsel had taken the statement out of context.

¶28         On redirect, the prosecutor told Tolbert that he wanted to ask her "some follow-up questions" to provide her "an opportunity to explain" her stolen gun statement to Harrell. In response to the prosecutor's questions, Tolbert again asserted that her statement to Harrell about stealing a gun was "unrelated" and "ha[d] nothing to do with this [case]." At that point, the prosecutor referred Tolbert to her direct examination testimony and the recorded, mid-trial conversation she had with Harrell. Defense counsel objected to the prosecutor's line of questioning, contending that it veered "[o]utside the scope of cross." The superior court overruled the objection, and the prosecutor continued, asking questions (with limited success given Tolbert's lack of cooperation and overall reluctance to testify) concerning the chronology of events—whether Tolbert's statement to Harrell that she had stolen a gun predated Harrell's

trial claim that she had furnished him with a gun on the night of the shooting.

¶29        Having carefully reviewed the record, we conclude that the prosecutor's questions on redirect examination did not exceed the scope of questioning on direct and cross-examination. Although the prosecutor did not question Tolbert on direct examination regarding the *relative timing* of her conversations with Harrell, he clearly asked her about the timing and content of the second conversation (which included the statement about Tolbert *supposedly* giving Harrell a gun). Likewise, defense counsel did not question Tolbert about the *relative timing* of her recorded conversations with Harrell, but he clearly cross-examined her regarding the content of the first conversation (which included the statement about Tolbert stealing a gun). Because the prosecutor's questions on redirect examination were simply responsive to defense counsel's questioning—albeit the prosecutor juxtaposed the two recorded conversations when previously each had been addressed separately—and Tolbert, on redirect examination, merely reiterated what she had said during direct and cross-examination, Harrell had a full opportunity to confront Tolbert and question her testimony. Accordingly, the superior court acted within its discretion by overruling Harrell's objection.

### B.      Lead Detective's Trial Testimony

¶30        Neither the prosecutor on direct examination nor the defense attorney on cross-examination questioned the lead detective about Harrell's appearance during his police interrogation or whether investigators took photographs of him at that time. On redirect, however, the prosecutor asked the lead detective whether law enforcement officers photographed Harrell on the day of his interview, approximately three weeks after the shooting. Defense counsel objected to the question, asserting it exceeded the scope of cross-examination. After the superior court overruled the objection, the prosecutor asked the detective whether he observed any injuries on Harrell during the interrogation, and the detective testified that he saw none.

¶31        When the prosecutor finished his redirect examination moments later, defense counsel informed the superior court that he had follow-up questions for the detective that could be handled either through recross-examination or by recalling the detective to testify during the defense's case-in-chief. The court denied defense counsel's request for recross-examination and invited defense counsel to simply recall the detective to the stand.

¶32        As part of the defense's case-in-chief, defense counsel recalled the detective to testify. At the outset, defense counsel told the detective that he wanted "to clear up some things" from the detective's prior testimony. But on direct examination, defense counsel did not ask the detective any injury-related questions. On cross-examination, however, the prosecutor asked the detective whether Harrell reported any injuries during his interview, and the detective testified that Harrell did not. The prosecutor also presented the detective with photographs taken of Harrell on the day of his interview and again asked the detective whether any injuries appeared visible that day. The detective again confirmed that he saw no signs of injury to Harrell on the day of the interview, either in person or in the photographs. On redirect examination, defense counsel directed the detective to examine one of the photographs and asked whether it reflected a "dark mark" over Harrell's left eyebrow. The detective responded, "[t]here's a discoloration." In a follow-up question, defense counsel asked the detective whether the discoloration may have been a "healing cut[]," and the detective answered, "I don't know."

¶33        On this record, we find no reversible error. While the injury-related questions posed to the detective on redirect during the State's case-in-chief arguably exceeded the scope of both direct and cross-examination, defense counsel had ample opportunity to question the detective, during the defense's case-in-chief, about Harrell's injury status at the time of the police interview. Indeed, immediately after the prosecutor concluded redirect examination of the detective during the State's case-in-chief, defense counsel told the superior court that any arguable infringement on Harrell's right to confront the detective could be remedied either through recross-examination or by recalling the detective to testify. Because Harrell had a full opportunity to challenge the detective's injury-related testimony when defense counsel recalled the detective to testify, the superior court's rulings on the scope of witness examination did not deprive Harrell of his constitutional right to present a full defense and confront all adverse witnesses against him.

## CONCLUSION

¶34        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA