IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

XAVIER JOHNSON, *Appellant.*

No. 1 CA-CR 24-0642

FILED 03-25-2026

Appeal from the Superior Court in Maricopa County
No. CR2024-109729-001
The Honorable Margaret LaBianca, Judge

**VACATED AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Deborah Celeste Kinney
*Counsel for Appellee*

Law Office of Randal B. McDonald, Phoenix
By Randal McDonald
*Counsel for Appellant*

**OPINION**

Presiding Judge David B. Gass delivered the opinion of the court, in which
Judge Michael J. Brown and Judge Andrew J. Becke joined.

**G A S S**, Judge:

¶1        Defendant Xavier Johnson appeals his three convictions and sentences for aggravated assault, unlawful imprisonment, and assault. All three were alleged as domestic violence offenses. He seeks reversal on three grounds. First, Johnson argues the superior court erred when it admitted hearsay statements from an emergency room doctor, a forensic nurse examiner, and the case agent in violation of Rule 803(4), Arizona Rules of Evidence ("Statement Made for Medical Diagnosis or Treatment") and the Confrontation Clause. *See State v. Rushton*, 172 Ariz. 454, 456 (App. 1992). Second, Johnson argues the superior court should have empaneled a twelve-person jury. Third, Johnson argues insufficient evidence supports his convictions.

¶2        Because the admission of the forensic examiner's testimony about the alleged offenses based on the victim's statements violated Johnson's Confrontation Clause rights, the court vacates all three convictions and sentences and remands to the superior court for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶3        The court views the facts in the light most favorable to upholding the jury's verdict, resolving all inferences against Johnson. *See State v. Reaves*, 252 Ariz. 553, 558 ¶ 2 (App. 2022). Because the victim did not testify, all the testimony and evidence came from other witnesses.

¶4        The victim was Johnson's girlfriend. For several days, the victim stayed at Johnson's extended-stay motel residence. The victim's daughters became concerned when the victim did not respond to calls and texts. One of them went to where Johnson was staying and knocked on the door. Before Johnson opened the door, the daughter heard what sounded like someone wrestling to turn the doorknob. When Johnson finally opened the door, he prevented the victim from leaving for several minutes. Eventually, the victim pushed past Johnson and left with her daughter, who took the victim to the hospital.

### I.        The victim made statements to a doctor at the hospital for medical treatment.

¶5        The victim told the examining doctor, who later testified at trial, she was there because she had a cut above her left eye near her eyebrow. During the physical examination, the doctor also noted her left eye was swollen and bruised.

¶6        The doctor asked the victim how her injuries occurred. She told the doctor "she had been struck by her boyfriend a couple of days before and that he wouldn't let her get medical care until that time." The victim told the doctor she had contacted the police and was at the hospital "seeking medical care." During his testimony, the doctor mentioned nothing about strangulation.

¶7        Based on the examination, the doctor did not order any testing or imaging. Because the cut was more than 24 hours old, the doctor provided primary direct wound care, saying the wound would heal without further intervention. At that point, the doctor discharged her.

II.        **The victim also made statements during police questioning at the hospital and during a forensic examination at a family advocacy center located in a police station.**

¶8        Two investigating police officers met the victim at the hospital. While talking with her, the victim told the officers the address where the assault occurred.

¶9        The case agent did not go to the hospital. Instead, he called the victim's phone later and arranged for a forensic examination at a family advocacy center in a City of Phoenix police station. This type of forensic examination specifically assists the police in gathering evidence. These forensic examiners only perform the forensic examinations if the police request them. And they only perform forensic examinations if they can complete them within five days of the alleged offense.

¶10        Advocacy centers are dedicated spaces where victim advocates help victims with any services they need. Advocacy centers often are in a police station, which is the case here, and the police often have a dedicated office within the advocacy center. The one in this case included an area made to look like a doctor's office for forensic examiners to use for police-requested forensic examinations.

¶11        Before the forensic examiner begins, the victim must consent to a forensic examination. As part of that consent, the forensic examiner discloses to the victim the forensic examination will be part of the police investigation and any criminal case the police pursue. With that understanding, the victim here consented to the examination.

¶12        The forensic examiner explained at trial how she regularly conducts the forensic examinations to ensure her "practice is done the same way with every single patient . . . every single time." The forensic examiner

said the process she followed with the victim here was consistent with the forensic examiner's regular practice.

¶13          The case agent asked the forensic examiner to conduct a forensic examination of the victim. Before the meeting, the case agent (who is not a medical professional) provided the forensic examiner with the victim's personal information. After meeting with the case agent, the forensic examiner met the victim in the family advocacy center's "medical room," obtained the victim's consent as described above, and then asked the victim "basic medical . . . questions that you would ask in a medical exam with your doctor or . . . nurse."

¶14          The forensic examiner then thoroughly examined the victim, documented all injuries in the victim's injury log, and asked clarifying questions. The forensic examiner provided the case agent with all the documentation from the victim's forensic examination. The forensic examiner testified about what the victim said verbatim by reading one of the quotes from the victim's injury log:

> He just -- before I knew it, he hit me like I was a guy. He punched me in my eyebrow right here. [points to left eye]. And I felt like I was going to pass out. And I said I need to go to the emergency room. And he said you're not going anywhere. And I just sat down and closed my eyes for two seconds. And he said get up, get up. Even if I went to the restroom, he was there. When I was in the shower, he was there. And when I got calls, I had to have it on speaker phone. During the day before he punched me, he got me in a choke hold. He came up from behind me and wrapped his arm around my neck. I was on my tippy toes. He is 6'1 or 6'2. And he had me good. I was about to pass out, but I didn't. I couldn't breathe at all.

The forensic examiner was the only witness who discussed strangulation.

### III.   Defendant's objections to testimony by the doctor, the forensic examiner, and the police officer.

¶15          Just after jury selection, the State disclosed the victim would not testify. At that point, Johnson's counsel made a hearsay and Confrontation Clause objection to the doctor and forensic examiner testifying, arguing they could not testify about the victim identifying Johnson during her medical examination and her forensic examination. The

State countered the statements were admissible hearsay, as the victim made the statements for medical diagnosis or treatment.

¶16 After briefing, the superior court ruled "the victim's statements . . . appear to have been made by the victim out of motivation to give the provider information for purposes of her medical care." The superior court thus ruled they were admissible under Rule 803(4), the exception to the rule against hearsay for statements made for the purpose of medical diagnosis or treatment.

¶17 During the police officer's testimony, the defendant made a hearsay objection to the police officer testifying about the victim's statements about the address where the assault took place.

**IV. An eight-person jury convicted Johnson on all three counts.**

¶18 The State indicted Johnson on three counts: (1) aggravated assault, a class 4 felony under A.R.S. §§ 13-1203, -1204, -3601, -701, and -801; (2) unlawful imprisonment, a class 6 felony under A.R.S. §§ 13-1301, -1303, -701, -702, -3601, and -801; and (3) assault, a class 1 misdemeanor under A.R.S. §§ 13-1203.A.1, -1203.B, -707, -3601, and -802.

¶19 The aggravated assault offense was based on Johnson allegedly strangling the victim in his residence the day before the daughter arrived:

> XAVIER JOHNSON, on or between February 16, 2024 and February 19, 2024, assaulted [the victim] and XAVIER JOHNSON intentionally or knowingly impeded the normal breathing or circulation of blood of [the victim] by applying pressure to the throat or neck or by obstructing the nose and mouth either manually or through the use of an instrument and the relationship between them is one of persons who currently are or were previously in a romantic or sexual relationship.

¶20 The unlawful imprisonment offense was based on Johnson allegedly not allowing the victim to leave his residence. And the misdemeanor assault was based on Johnson allegedly causing the victim physical injury while she was at his residence.

¶21 Based on the potential sentence Johnson faced, the parties agreed to an eight-person jury with two alternates. The State called eight witnesses, including the victim's two daughters, the two investigating

police officers who spoke with the victim at the hospital, the assigned case agent, the doctor, and the forensic examiner.

¶22     The jury convicted Johnson on all three counts. The superior court sentenced Johnson to prison for a slightly mitigated nine years on the aggravated assault conviction and for a slightly mitigated three years on the unlawful imprisonment conviction. The superior court imposed a six-month jail term on the misdemeanor assault conviction. The superior court ordered Johnson to serve the sentences concurrently and credited Johnson with 269 days of presentence incarceration credit.

¶23     The court has jurisdiction over Johnson's timely appeal under Article VI, Section 9, of the Arizona Constitution, and A.R.S. §§ 13-4031 and -4033.A.1.

## DISCUSSION

### I.     The doctor's testimony falls within the Rule 803(4) hearsay exception, but the forensic examiner's testimony does not.

¶24     Johnson argues the victim's statements to the doctor and the forensic examiner were "testimonial" for purposes of the Confrontation Clause. *See State v. Hill*, 236 Ariz. 162, 165–66 ¶¶ 11–14 (App. 2014). Those statements include the victim identifying Johnson as the perpetrator and discussing other events between Johnson and the victim in Johnson's residence, including the allegation Johnson strangled the victim from behind.

¶25     Johnson's counsel raised Rule 803(4) and Confrontation Clause issues at trial. Because Johnson raised the issue at trial, the court reviews the Confrontation Clause argument for harmless error. *See State v. Bocharski*, 218 Ariz. 476, 486 ¶¶ 38–41 (2008) (analyzing evidence admitted in violation of the Confrontation Clause for harmless error). In a harmless error review, the State bears the burden to show beyond a reasonable doubt that if an error occurred, it did not contribute to the verdict. *State v. Dunbar*, 257 Ariz. 421, 426 ¶ 14 (2024).

#### A.     Johnson challenges the admission of the doctor's and the forensic examiner's testimony under both Rule 803(4) and the Confrontation Clause.

¶26     The court reviews the superior court's "evidentiary rulings involving hearsay and related exceptions for an abuse of discretion." *State v. Giannotta*, 248 Ariz. 82, 83 ¶ 8 (App. 2019). "Generally, an abuse of

discretion 'is discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, 83 ¶ 19 (App. 2005) (quoting *Quigley v. Tucson City Ct.*, 132 Ariz. 35, 37 (1982)).

¶27 Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement," and is inadmissible unless it falls within at least one exception to the rule against hearsay. *See* Ariz. R. Evid. 801(c); Ariz. R. Evid. 802. Rule 803(4) is an exception to the rule against hearsay for statements made for medical diagnosis or treatment, regardless of whether the declarant is available as a witness. Under that exception, the superior court may admit, over a hearsay objection, an out-of-court statement "made for — and is reasonably pertinent to — medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." Ariz. R. Evid. 803(4). This exception to the rule against hearsay is not an excuse to admit every statement made to a medical professional.

¶28 When a court admits a hearsay statement, it may present a Confrontation Clause issue under the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Arizona Constitution. The Sixth Amendment guarantees the right of defendants in criminal prosecutions "to be confronted with the witnesses against" them. U.S. Const. amend. VI. It protects criminal defendants' right to a fair trial by ensuring they can cross-examine witnesses who testify against them. *Smith v. Arizona*, 602 U.S. 779, 783–84 (2024); *State v. Oliver*, 158 Ariz. 22, 30 (1988). Consistent with the Sixth Amendment, Arizona's Constitution says, "[T]he accused shall have the right . . . to meet the witnesses against him face to face . . . ." Ariz. Const. art. II, § 24. Arizona's Confrontation Clause essentially provides the same confrontation rights as the Sixth Amendment. *State v. Far W. Water & Sewer Inc.*, 224 Ariz. 173, 195 ¶ 76 n.10 (App. 2010) (citing *State v. Carr*, 216 Ariz. 444, 447 ¶ 9 n.2 (App. 2007)).

¶29 The Confrontation Clause generally bars "testimonial" statements. *See Crawford v. Washington*, 541 U.S. 36, 51–52 (2004). The United States Supreme Court has said statements are "testimonial" (and thus barred by the Confrontation Clause) "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). The "primary purpose" test requires a "combined inquiry that accounts for both the declarant and the interrogator." *Michigan v. Bryant*, 562 U.S. 344, 367 (2011). "[T]he relevant inquiry is not the subjective or

actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360.

**¶30**        The court recently addressed the "primary purpose" test for assessing whether statements are testimonial in this context in *State v. Trinidad*:

> The test for testimonial evidence is whether it was created for the primary purpose of creating an out-of-court substitute for trial testimony. On the other hand, evidence is not testimonial if created primarily to provide medical care. To determine the primary purpose of creating a medical report, Arizona courts assess where the examination took place, the victim's medical condition, whether law enforcement officers were present and the formality of the exchange.

257 Ariz. 485, 488 ¶ 11 (App. 2024) (internal citations and quotations omitted). The court reviews Confrontation Clause challenges *de novo*.

**¶31**        Based on the above, when analyzing Rule 803(4) and Confrontation Clause issues in this context, the court must make the following inquiry: Was the out-of-court statement "made for—and [was] reasonably pertinent to—medical diagnosis or treatment," or was it made for a testimonial purpose? The two options generally represent two sides of the same coin. As the United States Supreme Court explained, statements admissible under Rule 803(4) rarely trigger Confrontation Clause analysis because they are not testimonial. *See Giles v. California*, 554 U.S. 353, 376 (2008) (recognizing "statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules"). The differences between the doctor's and the forensic examiner's testimony highlight this distinction. On one side, if the statement was "made for—and is reasonably pertinent to—medical diagnosis or treatment," then it is not testimonial and does not trigger Confrontation Clause analysis and passes Rule 803(4)'s test. Ariz. R. Evid. 803(4)(A). On the other side, if the witness mainly made the statement for a testimonial purpose, it fails under Rule 803(4)'s test and triggers a Confrontation Clause analysis.

**B.    The superior court did not err when it allowed the doctor to testify about the victim's statements at the hospital emergency room.**

¶32        The superior court's admission of the victim's statements to the doctor complies with Rule 803(4)'s hearsay exception because they were "made for—and [were] reasonably pertinent to—medical diagnosis or treatment." Consistent with a medical examination, the doctor's initial question was, "[H]ow did this injury occur?" That kind of open-ended, "what happened" type of question generally is pertinent to diagnosis and treatment. *See United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir. 1980). The same is not true of a "who assaulted" you type of question, which seldom, if ever, would be sufficiently related. *See id.*

¶33        The doctor's testimony is not barred by the Confrontation Clause as identified in *dicta* in *Giles*: "statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules." *Giles*, 554 U.S. at 376. The logic behind that reasoning is statements made to secure medical treatment are not "testimonial," so they do not trigger a Confrontation Clause analysis. *Id.*

¶34        The evidence shows the victim's primary purpose in making the statements to the doctor was to secure medical treatment. *See id.* The victim went directly to the hospital the same night after leaving Johnson's residence. The doctor met with the victim in a hospital examination room. No police or other state actors were present. When asked, the victim told the doctor she was at the hospital to secure medical treatment.

¶35        The doctor's examination proceeded as one would expect. The doctor said he immediately noticed the victim had swelling and bruising. The injuries prompted the doctor to ask the victim, "[H]ow did this injury occur?" The doctor said the victim responded by saying "she had been struck by her boyfriend a couple of days before and that he wouldn't let her get medical care until that time." When the doctor asked the victim if she called the police, the victim told him yes and she was at the hospital for medical treatment. The doctor then treated the cut above the victim's left eye and discharged her.

¶36        The doctor also said he regularly takes direct quotes from patients, explaining the importance in noting a patient's reasons, causes, or injuries sustained, in their own words rather than merely summarizing them. That explanation also tracks with providing medical treatment because doctors often rely on such details to determine what is best for their

patient. *See State v. Strickland*, 1 CA-CR 24-0358, 2025 WL 2220035, at *5 ¶ 37 (Ariz. App. Aug. 5, 2025) (mem. decision) ("The doctor testified the note provided background information on the patient, the safeness of a patient's situation, especially if they are children, which would help the doctor treat the patient and then decide the patient's care plan after treatment, including post-discharge care.").

¶37 The superior court thus did not abuse its discretion by admitting the victim's statements to the doctor. "Courts routinely admit victims' statements made in response to questions necessary for medical treatment." *Hill*, 236 Ariz. at 166 ¶ 16 (citations omitted). Similarly, "the question that prompted the statement at issue—'Why are you here?'—is the starting point of any ordinary medical examination." *Id.* at 168 ¶ 24.

### C. The forensic examiner's testimony violates the Confrontation Clause for Johnson's aggravated assault and domestic violence conviction and is inadmissible under Rule 803(4)'s hearsay objection.

#### 1. The victim made the out-of-court statements to the forensic examiner for the primary purpose of "creating an out-of-court substitute for trial testimony."

¶38 The court considers whether the primary purpose of the forensic examination was creating testimonial evidence or was "made for—and is reasonably pertinent to—medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause" under Rule 803(4). *See Trinidad*, 257 Ariz. at 488 ¶ 11. The court thus analyzes "whether it was created for the primary purpose of creating an out-of-court substitute for trial testimony." *Id.* That analysis requires the court to consider "where the examination took place, the victim's medical condition, whether law enforcement officers were present and the formality of the exchange." *Id.*

¶39 As reflected at trial, the forensic examiner met the victim at a family advocacy center located in a police station, not at a hospital or medical office, even though the forensic examiner is employed by HonorHealth and HonorHealth contracts with Maricopa County to perform these police-initiated forensic examinations. The police, not a healthcare provider, control whether the forensic examiner will conduct an examination even if the victim requests it. And the forensic examiner will examine a victim only if the forensic examination can happen within five days of the alleged offense, regardless of the victim's need for treatment. In

short, though the forensic examiner is employed by a healthcare provider, the police control the forensic examination process.

¶40        The forensic examiner meets with the police before meeting with the victim. And the victim must agree to waive any medical privilege so the forensic examiner can share the results of the forensic examination with the police and prosecutors as part of a criminal prosecution. The forensic examiner tells the victim all information will be shared if the victim agrees to proceed. Though the police were not in the room for the forensic examination, the court cannot ignore the reality of their nearby presence, their role in securing the forensic examination, and their purpose in facilitating the forensic examination.

¶41        The record does not suggest the victim met with the forensic examiner to secure additional medical treatment. The victim had been to the emergency room where the doctor treated and discharged her. Nothing in the record suggests she needed further medical care after her discharge from the emergency room. And nothing in the record suggests the doctor recommended she secure any further medical treatment. The victim did not ask to meet with the forensic examiner to secure medical treatment. She met with the forensic examiner at the case agent's request. And the forensic examiner's testimony is silent on administering any medical treatment or recommending any course of treatment based on the forensic examination.

¶42        Though not a medical office or hospital, the police try to make the forensic examination section of the family advocacy center look "like a real doctor's office." But the family advocacy center sits in a police station, an environment with heightened police involvement. And the forensic examiner's final report specifically referenced the Phoenix Police DR number associated with the victim's case.

¶43        Arizona courts have described two potential purposes for a forensic nurse examination: "to gather evidence for a criminal investigation and to provide medical care to the victim." *Hill*, 236 Ariz. at 167 ¶ 19. Under the facts here, the primary purpose was gathering evidence for the criminal investigation. And the forensic examiner described her role as such: "[T]he forensic part . . . is the collection of evidence off of the patient's body or clothing, blood, urine, things of that nature. . . . And this is the medical evaluation of the patient that has been a victim of . . . strangulation."

¶44        Based on the above, the victim made the statements "for the primary purpose of creating an out-of-court substitute for trial testimony." *Trinidad*, 257 Ariz. at 488 ¶ 11. And because the victim did not testify, the

State used it for that very purpose. For that reason, those statements cannot fall within the Rule 803(4) exception allowing the admission of hearsay statements "made for — and . . . reasonably pertinent to — medical diagnosis or treatment; and describes medical history; past or present symptoms or sensations; their inception; or their general cause." It thus was error to admit the hearsay statements the victim made to the forensic examiner under the Confrontation Clause.

### 2. Admission of the victim's statements to the forensic examiner was not harmless error for Johnson's aggravated assault conviction.

**¶45** Though the court identifies a Confrontation Clause violation, constitutional error can be harmless. *See Dunbar*, 257 Ariz. at 426 ¶ 14. Under the harmless error standard, the State has the burden to prove beyond a reasonable doubt that the error did not contribute to the verdict. *See id.* The harmless error standard does not depend on whether "a guilty verdict would surely have been rendered" absent the error. *State v. Leteve*, 237 Ariz. 516, 524 ¶ 25 (2015) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)). The question, instead, is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.* (quoting *Sullivan*, 508 U.S. at 279).

**¶46** The State argues any error was harmless because (1) testimony by the forensic examiner about the injury-related statements "was cumulative to [the doctor's] testimony"; and (2) "the jurors could reasonably infer that Johnson was the assailant and committed all three offenses based on evidence outside of the testimony from the doctor and the forensic examiner. But these arguments do not demonstrate how the error did not "contribute to or affect" the jury's verdict. *See State v. Yazzie*, 232 Ariz. 615, 618 ¶ 11 (App. 2013) (concluding the State failed to carry its burden under harmless error review when it did not explain why the jury's verdict did not result from error).

**¶47** For the aggravated assault offense, the superior court instructed the jury it could convict Johnson only if the jury found he "intentionally or knowingly impeded the normal breathing or circulation of blood of [the victim] by applying pressure to the throat or neck or by obstructing the nose and mouth."

**¶48** The forensic examiner was the sole witness who said Johnson strangled the victim. The forensic examiner first explained strangulation. Her explanation tracks the jury instruction, saying strangulation occurs

"when the blood supply to the brain is disrupted and/or the breathing is disrupted." The forensic examiner next testified the victim was in a relationship with the individual who strangled her.

> Q. And did [the victim] tell you the name of the person who hurt her?
>
> A. We do ask what the association is, again, to establish that it is a domestic violence. And a lot of times we don't get the name. I'm going to have to find it here. Dating relationship.
>
> Q. So she didn't give you a name of an individual. She just said the person who caused her harm she was dating or was boyfriend/girlfriend with?
>
> A. Correct.

¶49        Statements identifying an individual who attacked a victim generally are inadmissible. *See Iron Shell*, 633 F.2d at 84 (saying victims' answers to "who hurt you" types of question seldom, if ever, are sufficiently related). One exception is when those statements "are made for—and [are] reasonably pertinent to—medical diagnosis or treatment." Ariz. R. Evid. 803(4); *see State v. Lopez*, 217 Ariz. 433, 436 ¶¶ 10–11. The forensic examiner's line of questioning here primarily focused on law enforcement purposes, not medical treatment. The forensic examiner asked for the association between the victim and the alleged perpetrator "to establish that it is a domestic violence," not to assess the victim's injuries.

¶50        Though the forensic examiner testified about the process she used for identifying and documenting injuries, she did not testify about any diagnosis or treatment she provided. And the forensic examiner provided "a copy of that report" to the case agent for the investigation but did not say she gave the victim the report for any further treatment.

¶51        And contrary to the State's argument, the forensic examiner's testimony about strangulation was not cumulative. No other witness said the victim was strangled or identified Johnson as the perpetrator. The forensic examiner was the sole witness who discussed the victim's strangulation. Without that testimony, the jury could not have convicted Johnson of aggravated assault and domestic violence because that conviction required the State to prove Johnson strangled the victim. The State thus cannot show beyond a reasonable doubt admission of the forensic examiner's testimony "did not contribute to the verdict or sentence" for that count. *See Dunbar*, 257 Ariz. at 426 ¶ 14.

### 3. Admission of the victim's statements to the forensic examiner also was not harmless error for Johnson's unlawful imprisonment and misdemeanor assault offenses.

**¶52**        Admission of the victim's statements to the forensic examiner related to the unlawful imprisonment and assault also was not harmless. Though the victim's two daughters and the doctor provided statements related to these offenses, the forensic examiner's statement set forth in Paragraph 14 above concisely and cohesively explained all three convictions in the victim's words. Those statements addressed Johnson strangling the victim, Johnson refusing to allow the victim to leave his residence, and Johnson punching the victim in the face. Because of the importance of victim testimony, the victim's hearsay description of the events will affect a trial, especially if a victim does not testify. *Cf. S.A. v. Superior Ct.*, 171 Ariz. 529, 532 (App. 1992) (discussing the importance of victim testimony in criminal prosecutions).

**¶53**        The State argues one of the victim's daughters testified to seeing "strangulation marks" around the victim's neck. But the State did not qualify that daughter as a strangulation expert, and nothing in the record suggests she is one. The daughter's limited basis for the statement was her work as a caregiver and her familiarity with wound care. But she offered no foundational testimony about her experience diagnosing or treating strangulation wounds or marks.

**¶54**        The State also argues the photographs show the victim had marks on her neck, but that evidence would not support a conviction without more. That more here was the forensic examiner's concise and cohesive statement that the victim said: "[H]e got me in a choke hold. He came up from behind me and wrapped his arm around my neck. I was on my tippy toes. He is 6′1 or 6′2. And he had me good. I was about to pass out, but I didn't. I couldn't breathe at all."

**¶55**        The State thus cannot show beyond a reasonable doubt admission of the forensic examiner's testimony "did not contribute to the verdict[s] . . . or sentence[s]" for these counts. *See Dunbar*, 257 Ariz. at 426 ¶ 14. It thus was not harmless error to admit the forensic examiner's testimony on the unlawful imprisonment and assault convictions. *See id.*

### II. It was harmless error to allow the police officer to testify the victim told him where Johnson assaulted her.

¶56 It was error to allow the police officer to say what the victim told him about the address where the alleged assault took place. The victim's statement to the officer was hearsay. Crime scene locations do not fall under any exception to the rule against hearsay, and the State offers no other justification for its admission.

¶57 Still, the officer's testimony about the victim explaining the location of her injuries was cumulative to the two daughters' and the doctor's testimony about where the victim sustained her facial injuries. *See State v. Williams*, 133 Ariz. 220, 226 (1982). The State thus met its burden of showing "the guilty verdict actually rendered in this trial was surely unattributable to the error." *Leteve*, 237 Ariz. at 524 ¶ 25 (quoting *Sullivan*, 508 U.S. at 279). So though the court admitted the officer's testimony in error, the error was harmless beyond a reasonable doubt. *See Dunbar*, 257 Ariz. at 426 ¶ 14.

### III. The superior court did not commit fundamental error when it empaneled an eight-person jury.

¶58 Because Johnson did not object to the empanelment of an eight-person jury in the superior court, the court reviews for fundamental error. *See State v. Melendez*, 259 Ariz. 282, 289 ¶ 16 (2025). If the court's review shows error occurred, the court must "evaluate whether the error was fundamental and prejudicial." *Id.* To show fundamental error, Johnson must establish (1) an error going to the foundation of his case, (2) error depriving him of a right essential to his defense, or (3) error of such magnitude he could not possibly have received a fair trial. *See State v. Escalante*, 245 Ariz. 135, 142 ¶ 22 (2018). To prove prejudice, Johnson must show "that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* at 144 ¶ 31. The defendant bears the burden of proving fundamental error resulting in prejudice. *See Melendez*, 259 Ariz. at 289 ¶ 16.

¶59 Johnson challenges the constitutionality of Arizona's eight-person jury provision. Johnson faced a maximum cumulative sentence of less than 30 years. For that reason, Johnson was entitled to an eight-person, not a twelve-person, jury under the Arizona Constitution and section 21-102. *See* Ariz. Const. art. II, § 23; A.R.S. § 21-102.

¶60 Arizona adopted the eight-person jury model after the 1970 case in which the United States Supreme Court said the Sixth Amendment does not require a twelve-person jury for criminal trials in *Williams v. Florida*, 399 U.S. 78, 86–103 (1970). After *Williams*, the people of Arizona

amended the Arizona Constitution to permit eight-person juries in criminal cases when a defendant faces a prison sentence of less than 30 years. *See* Ariz. Const. art. II, § 23 (amended 1972); A.R.S. § 21-102.B. Under Arizona law, a defendant is entitled to a twelve-person jury only if the defendant faces "a sentence of death or imprisonment for thirty years or more." *See* Ariz. Const. art. II, § 23 (amended 1972); A.R.S. § 21-102.A.

**¶61** Johnson concedes "there is no evidence *Williams* has been expressly overruled" on the size of criminal jury. Johnson instead argues the United States Supreme Court implicitly overruled *Williams* through both *Giles v. California*, 554 U.S. 353 (2008) and *Ramos v. Louisiana*, 590 U.S. 83 (2020). *See United States v. Rice*, 719 F. Supp. 3d 618, 630 (W.D. Tex. 2024) ("One situation in which an implicit overruling may occur is where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis . . . ." (internal quotes omitted)). Because the United States Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*," Johnson's arguments do not carry the day. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

**¶62** As discussed above, in *Giles*, the United States Supreme Court considered whether the defendant forfeited his Sixth Amendment right to confront a witness against the defendant when a judge determines a wrongful act by the defendant made the witness unavailable to testify at trial. *See Giles*, 554 U.S. at 375. *Giles* was silent on jury size, and Johnson does not explain how the reasoning in *Giles* "vitiates" the analysis of jury size in *Williams* despite the silence. *Id.*

**¶63** In *Ramos*, the United States Supreme Court decided the Sixth Amendment requires criminal jury trials to have a unanimous vote but was also silent on jury size. *See Ramos*, 590 U.S. at 87. Johnson cites the dissenting opinion in *Ramos* to argue *Williams* was implicitly overruled. *See id.* at 158 (Alito, J., dissenting) ("Repudiating the reasoning of *Apodaca* will almost certainly prompt calls to overrule *Williams*."). But a dissenting justice's mere suggestion the United States Supreme Court might overturn *Williams* is not enough for the court to conclude *Williams* has been implicitly overruled.

**¶64** Consistent with that reasoning and showing the United States Supreme Court has not implicitly overruled *Williams*, the court considered this issue a few years ago and also ruled *Ramos* did not overrule *Williams* because it does not address jury size. *State v. Khorrami*, 1 CA-CR 20-0088, 2021 WL 3197499, at *8 ¶ 53 (Ariz. App. July 29, 2021), *cert. denied sub nom Khorrami v. Arizona*, 143 S. Ct. 22, 23–27 (2022). When the United States

Supreme Court denied Khorrami's certiorari petition, Justice Gorsuch dissented, explaining:

> Khorrami asks us to reconsider *Williams*. Regrettably, the Court today declines to take up that task. *Williams* was wrong the day it was decided, it remains wrong today, and it impairs both the integrity of the American criminal justice system and the liberties of those who come before our Nation's courts.

*Id.* at 23 (2022) (Gorsuch, J., dissenting).

¶65          The court thus cannot conclude the United States Supreme Court silently changed a fundamental feature of its Sixth Amendment jurisprudence, particularly given the issue was neither raised nor litigated in *Giles* or *Ramos*. The court thus declines Johnson's invitation to reconsider the constitutionality of eight-person juries in Arizona.

## CONCLUSION

¶66          The court vacates Johnson's convictions and remands to the superior court for further proceedings.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:            JR